### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF MISSOURI

**ASIA CALDWELL, as the surviving daughter of decedent, LEANDRA YOUNG-WILSON; and as the soon to be appointed administrator of THE ESTATE OF LEANDRA YOUNG-WILSON**

**Plaintiff,**

**v.**

**REDMAN RD HEALTHCARE LLC**
Serve:
Registered Agent Solutions, Inc.
5661 Telegraph Rd Ste 4B
Saint Louis, MO 63129

**REDMAN RD CONSULTING LLC**
Serve:
Registered Agent Solutions, Inc.
5661 Telegraph Rd Ste 4B
Saint Louis, MO 63129

**VERTICAL HEALTH SERVICES LLC**
Serve:
Registered Agent Solutions, Inc.
5661 Telegraph Rd Ste 4B
Saint Louis, MO 63129

**Defendants.**

**Case No. Case No.**

**JURY TRIAL DEMANDED**

### PLAINTIFF'S COMPLAINT FOR DAMAGES

The Plaintiff, by and through undersigned counsel, submits this Complaint for Damages against the above-named Defendants, and in further support, states and alleges as follows:

### PLAINTIFF

1.  Leandra Young-Wilson ("Resident") suffered avoidable pressure ulcers/bedsores on or about January 30, 2024, at REDMAN RD HEALTHCARE LLC.

2.  Resident suffered conscious pain and suffering and died from avoidable pressure ulcers/bedsores on August 11, 2024.

1

3.  Plaintiff Asia Caldwell has been an adult over the age of 21 and is a citizen of Missouri.

4.  Plaintiff Asia Caldwell is the surviving daughter of Resident, and therefore, member of the class of individuals authorized to pursue a wrongful death claim pursuant to RSMo. § 537.080.

## DEFENDANTS

5.  Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

## REDMAN RD HEALTHCARE LLC

6.  At all times relevant, REDMAN RD HEALTHCARE LLC was a Washington limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, and did business as Atrium Place Health and Rehabilitation.

7.  As such, REDMAN RD HEALTHCARE LLC was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling REDMAN RD HEALTHCARE LLC.

8.  Consequently, REDMAN RD HEALTHCARE LLC, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at REDMAN RD HEALTHCARE LLC.

## REDMAN RD CONSULTING LLC

9.  At all times relevant, REDMAN RD CONSULTING LLC was a Washington limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, REDMAN RD HEALTHCARE LLC.

10. As such, REDMAN RD CONSULTING LLC was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling REDMAN RD HEALTHCARE LLC.

11. Consequently, REDMAN RD CONSULTING LLC, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at REDMAN RD HEALTHCARE LLC.

12. REDMAN RD CONSULTING LLC and/or individuals or entities acting on its behalf, operated, managed, maintained, and controlled REDMAN RD HEALTHCARE LLC by exercising final authority over: (1) Staffing budgets; (2) The development and implementation of nursing policies and procedures; (3) The hiring and firing of REDMAN RD HEALTHCARE LLC leadership.

13. REDMAN RD CONSULTING LLC and/or individuals or entities acting on its behalf, operated, managed, maintained, and exercised final authority over REDMAN RD HEALTHCARE LLC of: (1) Staffing budgets; (2) The development and implementation of nursing policies and procedures; (3) The hiring and firing of REDMAN RD HEALTHCARE LLC leadership.

14. It was REDMAN RD CONSULTING LLC's intention to cut operating expenses at REDMAN RD HEALTHCARE LLC through cutting of labor expenses while increasing revenue through increased census.

15. These actions and business decisions had a direct impact on the care provided to all residents including Resident.

16. Consequently, REDMAN RD CONSULTING LLC owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at REDMAN RD HEALTHCARE LLC and breached said duty for all the reasons stated in this Petition.

## VERTICAL HEALTH SERVICES LLC

17. At all times relevant, VERTICAL HEALTH SERVICES LLC was a Washington limited liability company and owned, operated, managed, maintained, and/or controlled, in whole or in part, REDMAN RD HEALTHCARE LLC.

18. As such, VERTICAL HEALTH SERVICES LLC was engaged in providing ancillary medical services to persons requiring such services, including Resident, by owning, operating, managing, maintaining, and controlling REDMAN RD HEALTHCARE LLC.

19. Consequently, VERTICAL HEALTH SERVICES LLC, owed a duty to Resident to use reasonable care for Resident's safety while under the care and supervision at REDMAN RD HEALTHCARE LLC.

20. VERTICAL HEALTH SERVICES LLC and/or individuals or entities acting on its behalf, operated, managed, maintained, and controlled REDMAN RD HEALTHCARE LLC by exercising final authority over: (1) Staffing budgets; (2) The development and implementation of nursing policies and procedures; (3) The hiring and firing of REDMAN RD HEALTHCARE LLC leadership.

21. VERTICAL HEALTH SERVICES LLC and/or individuals or entities acting on its behalf, operated, managed, maintained, and exercised final authority over REDMAN RD HEALTHCARE LLC of: (1) Staffing budgets; (2) The development and implementation of nursing policies and procedures; (3) The hiring and firing of REDMAN RD HEALTHCARE LLC leadership.

22. It was VERTICAL HEALTH SERVICES LLC's intention to cut operating expenses at REDMAN RD HEALTHCARE LLC through cutting of labor expenses while increasing revenue through increased census.

23. These actions and business decisions had a direct impact on the care provided to all residents including Resident.

24. Consequently, VERTICAL HEALTH SERVICES LLC owed a duty to Resident to use reasonable care for Resident's safety while under its care and supervision at REDMAN RD HEALTHCARE LLC and breached said duty for all the reasons stated in this Petition.

## DEFENDANTS' JOINT ENTERPRISE/VENTURE

25. Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

26. Defendants REDMAN RD HEALTHCARE LLC; REDMAN RD CONSULTING LLC; and VERTICAL HEALTH SERVICES LLC ("Joint Venture Defendants") were engaged in a joint venture in that:

   a. The Joint Venture Defendants had an agreement, express and/or implied, among the members of the group to operate REDMAN RD HEALTHCARE LLC, a Missouri licensed skilled nursing facility;

   b. The Joint Venture Defendants had had a common purpose to operate REDMAN RD HEALTHCARE LLC, a Missouri licensed skilled nursing facility;

5

c. The Joint Venture Defendants had a community of pecuniary interest in the operation of REDMAN RD HEALTHCARE LLC, a Missouri licensed skilled nursing facility; and

d. The Joint Venture Defendants had had an equal right to a voice in the direction of the operation of REDMAN RD HEALTHCARE LLC, a Missouri licensed skilled nursing facility.

e. There has been always a close relationship between the Joint Venture Defendants relevant.

27. Because of the joint venture, the Joint Venture Defendants owed a joint duty to Resident to use reasonable care for their safety while under their care and supervision at REDMAN RD HEALTHCARE LLC.

## JURISDICTION AND VENUE

28. Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

29. As alleged above, each defendant is a citizen of Washington. Thus, each defendant is a citizen of Washington.

30. Plaintiff is a citizen of Missouri.

31. Therefore, Plaintiff brings these claims contained in the Complaint under federal diversity jurisdiction, 28 U.S.C. § 1332(a)(1), as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

32. Pursuant to RSMo § 506.500, defendants purposefully availed themselves of the protections and/or benefits of the laws in Missouri by entering into contracts with entities in Missouri that then permitted them to commit tortious acts within the state including, but not limited to, failing to ensure that REDMAN RD HEALTHCARE LLC had appropriate policies and procedures for its nursing staff, was properly capitalized, funded, staffed, and that staff received adequate training and supervision, thereby making jurisdiction proper in this Court.

33. A substantial part of the events or omissions giving rise to the claims described in the Complaint occurred in Missouri, thereby making venue proper in this Court.

## AGENCY

34. The acts hereinafter described were performed by the agents, representatives, servants, and employees of Defendants and were performed either with the full knowledge and consent of Defendants, and/or were performed by their agents, representatives, servants, or employees during the scope of their agency, representation, or employment with the Defendants.

35. Furthermore, the acts hereinafter described as being performed by the agents, representatives, servants, or employees of Defendants were performed or were supposed to be performed on behalf of and/or for the benefit of Resident.

## FACTUAL BACKGROUND

36. Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

**Patient Background & Pre-Existing Conditions**

37.  Resident's medical history included: hereditary cerebellar ataxia resulting in quadriplegia and total immobility, Type 2 diabetes mellitus, severe malnutrition, and complete dependence on caregivers for all activities of daily living including repositioning, toileting, feeding, and hygiene.

38.  At the time of Resident's admission to Atrium Place Health and Rehabilitation on January 30, 2024, Resident was a 41-year-old woman who had been evaluated at Barnes Jewish Hospital Emergency Department on January 22, 2024, where she was documented to have three Stage 1 pressure ulcers — superficial, reversible wounds on the right buttock, left buttock, and sacral region. The home health nurse who called EMS on January 30, 2024, reported that Resident's 'wounds [were] worsening and [the patient was] not being cared for,' precipitating Resident's admission to Defendants' facility for skilled nursing care.

**Specific Negligence — Wound Progression at Defendants' Facility**

39.  On or about January 30, 2024: Admission with Stage 1 Pressure Ulcers. Resident was admitted to Atrium Place Health and Rehabilitation with three Stage 1 pressure ulcers (right buttock, left buttock, and sacral region) — superficial, clinically reversible wounds that, with proper nursing care, should have healed rather than progressed. At the time of admission, Resident weighed approximately 84 pounds, had a Braden Scale score indicating high risk for skin breakdown, and was completely bedbound and dependent on staff for all repositioning.

40. On or about February 9, 2024: MDS Assessment Confirmed Wounds Present on Admission. An MDS (Minimum Data Set) assessment confirmed two unhealed Stage 3 pressure ulcers present upon admission, yet Defendants failed to develop or implement an individualized, comprehensive care plan with specific interventions to prevent further wound deterioration. No individualized turning logs, per-shift skin checks, or wound care tracking documentation was initiated.

41. On or about February 15, 2024: Severe Malnutrition Documented Without Escalation. Defendants documented that Resident weighed only 84.2 pounds — representing an approximate 50-pound weight loss — placing Resident at extreme risk for pressure injury progression and impaired wound healing. Despite this finding, Defendants failed to escalate nutritional support, failed to obtain timely dietitian consultation, and failed to implement an aggressive nutritional supplementation plan, all of which are required interventions for a malnourished resident with active pressure injuries.

42. On or about February 25, 2024: Only Documented Repositioning Attempt in Approximately 98 Days. A nursing note documented the only repositioning attempt during Resident's entire approximately 98-day stay at Defendants' facility: 'Attempted to turn resident to side... She began crying stating she did not want to... She stated that this was her decision and she did not want to turn.' This single documented attempt represents a catastrophic failure of care. Defendants failed to address the pain barrier to repositioning, failed to offer pain pre-medication before turning, failed to provide any alternative pressure-relief interventions, and failed to make any subsequent repositioning attempts for the remaining 73 or more days of Resident's stay. The same nurse noted that Resident's wounds had 'both deteriorated,' yet Defendants took no meaningful action to reverse this trajectory.

43. On or about February 26, 2024: Care Plan Updated Without Addressing Root Cause. Defendants updated Resident's care plan to add 'EDUCATE ON REPOSITIONING AND OFFLOADING' but critically failed to address the documented pain barrier that prevented repositioning. No pain pre-medication protocol was added, no alternative positioning strategies were implemented, and no specialist referral was initiated despite clear evidence of wound deterioration and resident distress during repositioning.

44.     On or about February 27, 2024: Continued Wound Deterioration and Weight Loss. A wound assessment documented that Resident's coccyx wound had grown to 7.4 x 3.2 x 0.8 centimeters (23.68 square centimeters) with signs of infection present. Resident's weight had dropped to 78 pounds — the lowest recorded weight during her stay. Oxycodone was ordered for pain, yet Defendants still failed to implement a protocol to pre-medicate Resident before repositioning or wound care.

45.     On or about March 4, 2024: MDS Falsely Documents No Wounds Despite Active Stage 3 Ulcers. Defendants completed an MDS Quarterly Assessment documenting two Stage 3 pressure ulcers while simultaneously coding Section M as having no wounds present — a direct contradiction of the concurrent wound documentation. Furthermore, Defendants changed the 'Present on Admission' coding from '2' (present on admission) to '0' (not present on admission), thereby misrepresenting the origin and chronicity of Resident's wounds. This pattern of false documentation is consistent with intentional concealment of care failures and potential Medicare fraud, as Defendants billed for a turning program (MDS M1200C coded as 'YES') when no systematic turning was documented or implemented.

46.     On or about March 5, 2024: Catastrophic Wound Progression to Bone Exposure. A wound assessment revealed that Resident's coccyx wound had expanded catastrophically to 74.6 square centimeters in area with a maximum depth of 2.0 centimeters, with 10 percent of the wound bed showing exposed bone (visible structures). The wound nurse documented that 'Wounds have both deteriorated and are now one wound,' accompanied by sero-sanguineous drainage and strong odor. This progression from Stage 1 to Stage 4 with bone exposure occurred over approximately 34 days of Defendants' care and was the direct, foreseeable, and avoidable result of Defendants' near-complete abandonment of repositioning protocols, failure to address nutritional deficiencies, and failure to treat developing infection.

47.     On or about April 9, 2024: First Facility-Acquired Pressure Ulcer Documented. Defendants' own wound assessment documented a new open pressure ulcer on Resident's left ischial tuberosity, measuring approximately 9.3 square centimeters. Critically, Defendants' own records explicitly documented the origin of this wound as 'facility' — an admission by Defendants that this wound was acquired under their care. The development of a new facility-acquired wound while the admission wounds continued to deteriorate demonstrates a systemic failure of pressure injury prevention at every level.

48.    On or about May 7, 2024: Second Facility-Acquired Pressure Ulcer Documented. Defendants' wound assessment documented yet another new facility-acquired pressure ulcer, this time on Resident's right ischial tuberosity, measuring approximately 8.3 square centimeters. This wound was also explicitly documented as having been caused at the 'facility.' By this date, Resident had a total of four active pressure ulcers — two admission wounds that had progressed catastrophically under Defendants' care, and two entirely new wounds acquired at Defendants' facility — demonstrating that Defendants' care failures were ongoing, systemic, and unabated.

49.    On or about May 9, 2024: Pain Medication Change Acknowledges Ongoing Suffering. Defendants changed Resident's pain medication from PRN (as needed) to routine dosing, documenting 'increase pain noted, added routine pain medication.' This acknowledgment of escalating pain confirms that Resident endured prolonged, progressive suffering as a direct result of Defendants' failures to prevent wound progression and treat the underlying causes of her pain.

50.    On or about May 13, 2024: Transfer with Four Active Pressure Ulcers. Resident was transferred from Defendants' facility to St. Louis Place Health and Rehabilitation with four total pressure ulcers — the two original admission wounds that had deteriorated from Stage 1 to Stage 4 with osteomyelitis, and two entirely new facility-acquired pressure ulcers at the bilateral ischial tuberosities. Resident had active osteomyelitis requiring ongoing IV antibiotics, severe malnutrition, and was completely bedbound. The damage inflicted by Defendants' approximately 104 days of neglect was irreversible.

13

### <u>Causation — Infection, Sepsis, and Death</u>

51.   On or about January 30, 2024: Elevated White Blood Cell Count at Admission Indicates Early Infection. At the time of Resident's admission to Defendants' facility, laboratory results showed an elevated white blood cell count of 12.1 K/cumm, indicating early infection. Despite this warning sign, Defendants failed to implement aggressive infection monitoring protocols or obtain infectious disease consultation.

52.   On or about February 9, 2024: Positive Wound Culture Met with Inadequate Treatment. A positive wound culture confirmed active wound infection. Defendants prescribed only a short course of Levofloxacin — an inadequate treatment given the clinical presentation of deep, deteriorating wounds with signs of developing osteomyelitis. No long-term antibiotic plan was developed, no follow-up cultures were ordered, and no infectious disease specialist was consulted.

53.   On or about March 6, 2024: Emergency Hospitalization for Sepsis, Respiratory Failure, and Osteomyelitis. Resident was being transported for an MRI when her condition acutely deteriorated. Emergency Medical Services found Resident with oxygen saturations of 84 percent, heart rate of 156, and hypotension. Resident was diverted to Christian Hospital where she was admitted with a principal diagnosis of Sepsis (ICD-10: A41.9) coded as 'Present on Admission' from Defendants' nursing home. Additional diagnoses, all coded as present on admission, included Stage 4 pressure ulcer of the sacrum (L89.154), Osteomyelitis (M86.9), Severe protein-calorie malnutrition (E43), Quadriplegia (G82.50), Acute respiratory failure with hypoxia (J96.01), and Cachexia (R64). Her white blood cell count was 23.3 K/cumm — severely elevated — and her sepsis score was 7.55. This life-threatening emergency was the direct result of Defendants' failure to treat Resident's infected pressure injuries.

54. On or about March 7, 2024: Infectious Disease Physician Documents Facility's Failure to Treat Infection. Dr. Hasan, the Infectious Disease physician at Christian Hospital, independently documented: 'Chronic decubitus ulcers with possible osteomyelitis with no history of previous long-term antibiotic treatment per record review.' This third-party physician's finding establishes that Defendants knew or should have known of the deep wound infection and osteomyelitis, yet failed to provide the 6-week course of IV antibiotics that is the recognized standard of care for osteomyelitis. Triple IV antibiotics were initiated at the hospital, and a wound VAC was placed on Resident's sacral wound, which measured 9.5 x 9 x 2 centimeters with 1 to 2 centimeters of circumferential undermining and exposed bone — interventions that should have been initiated weeks earlier by Defendants.

55. On or about March 7, 2024: CT Imaging Confirms Bone Destruction Caused by Untreated Pressure Ulcers. CT imaging at Christian Hospital revealed 'bone destruction and osteitis' with 'discontinuity of the coccyx from the sacrum,' confirming that the untreated deep pressure ulcers had caused irreversible bone destruction and a life-threatening bone infection. Osteomyelitis is a direct and foreseeable consequence of Stage 4 pressure ulcers left untreated, and the development of osteomyelitis in this case was entirely avoidable had Defendants provided basic wound care, repositioning, and timely infection management.

56. On or about March 11, 2024: Wound Culture Confirms Polymicrobial Infection from Chronic Neglect. Wound cultures obtained at Christian Hospital revealed mixed microorganisms — a polymicrobial infection consistent with a chronic, neglected wound bed. This finding further corroborates that Defendants' facility allowed the wound infection to fester untreated for weeks before the septic crisis. Resident's white blood cell count began to normalize to 8.6 K/cumm only after receiving appropriate hospital-level care, including triple IV antibiotics and wound VAC therapy.

57. On or about March 13, 2024: Surgical Consultation Confirms Wounds Were Treatable. A surgical consultation at Christian Hospital documented that Resident's 'wounds are clean and have healthy granulation tissue' and that 'there is no need for any further surgical debridement.' This finding is critically important because it establishes that, with proper care, Resident's wounds were capable of healing — undermining any defense that wound progression was unavoidable. The surgeon recommended a diverting colostomy, which the family declined; however, the surgeon's documentation makes clear this was an optional, not mandatory, intervention.

58. On or about March 18, 2024: Discharged Back to Defendants' Facility with Ongoing Treatment Needs. Resident was discharged from Christian Hospital back to Defendants' facility with a wound VAC in place, a PICC line for IV antibiotics, and orders to continue a 6-week antibiotic course of Ceftriaxone and Metronidazole through April 20, 2024. Resident's white blood cell count had normalized to 6.7 K/cumm. Despite the clear demonstration that proper care could stabilize Resident's condition, Defendants continued to fail to implement basic pressure injury prevention measures upon Resident's return.

17

59. On or about April 30, 2024: Urgent Referral Confirms Ongoing Osteomyelitis and Bone Necrosis. Dr. Ryan Doyel issued an urgent referral to Barnes Jewish Hospital Wound Care Clinic with a diagnosis of L98.424 — Skin ulcer of sacrum with necrosis of bone (osteomyelitis). The referral documented: 'Sacral stage IV, Bilateral ischial unstageable pressure ulcers. Currently bed bound in skilled nursing facility.' IV Ceftriaxone 2 grams daily was continued. This referral confirms that, as of approximately 3.5 months before Resident's death, she still had a Stage 4 sacral wound with active bone necrosis, bilateral ischial unstageable wounds, and ongoing osteomyelitis — all conditions that originated from and were caused by Defendants' nursing home neglect.

60. On or about May 24, 2024: Missed Wound Clinic Appointment. Resident was a no-show for the Barnes Jewish Hospital Wound Clinic appointment scheduled by the urgent referral. At the time of this missed appointment, Resident was bedbound at a skilled nursing facility, and responsibility for arranging medical transport rested with the facility, not with Resident or her family.

18

61.   On or about August 11, 2024: Death. Resident died at Christian Hospital at 19:40, approximately five months after leaving Defendants' facility and approximately six months after Defendants' care failures precipitated the septic crisis of March 6, 2024. Throughout this period, Resident suffered from the ongoing consequences of Defendants' neglect — active osteomyelitis, four pressure ulcers, severe malnutrition, cachexia, and the progressive systemic effects of chronic wound infection. The temporal chain from Defendants' failures to Resident's death is unbroken: Resident was alive with reversible Stage 1 wounds at admission on January 30, 2024; Defendants' near-complete abandonment of repositioning and wound care allowed catastrophic progression to Stage 4 with osteomyelitis and sepsis; the resulting bone infection and systemic decline substantially contributed to and hastened Resident's death.

## Standard of Care Failures

62.   Upon information and belief, at no point while Resident was a resident at REDMAN RD HEALTHCARE LLC did any of REDMAN RD HEALTHCARE LLC management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from defendants, or any other staff member ever provide any sort of in-service training or clinical education to REDMAN RD HEALTHCARE LLC staff regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure ulcers in residents like Resident.

63. Upon information and belief, at no point while Resident was a resident at REDMAN RD HEALTHCARE LLC did any of REDMAN RD HEALTHCARE LLC management, including the Administrator, the Director of Nursing, the clinical education coordinator, anybody from defendants, or any other staff member ever implement the appropriate policies and procedures at REDMAN RD HEALTHCARE LLC regarding the assessment, prevention, use of interventions, monitoring, and reporting of pressure ulcers in residents like Resident.

64. Upon information and belief, while Resident was a resident at REDMAN RD HEALTHCARE LLC, REDMAN RD HEALTHCARE LLC did not have an adequate number of staff working daily at REDMAN RD HEALTHCARE LLC to meet Resident's needs, perform the interventions required to prevent Resident's avoidable pressure ulcers/bedsores, or monitor and adequately supervise Resident's condition.

**Undercapitalization/Underfunding at REDMAN RD HEALTHCARE LLC**

65. REDMAN RD HEALTHCARE LLC; REDMAN RD CONSULTING LLC; VERTICAL HEALTH SERVICES LLC (hereinafter collectively referred to as the "Corporate Defendants") had a duty to provide financial resources and support to REDMAN RD HEALTHCARE LLC in a manner that would ensure that each of their residents received the necessary care and services and attain or maintain the highest practicable physical, mental, and psychosocial well-being, consistent with their residents' comprehensive assessments and plans of care.

20

66.     The Corporate Defendants had a duty to provide sufficient financial resources to ensure there was enough properly trained and supervised staff to meet the needs of their residents.

67.     Upon information and belief, REDMAN RD HEALTHCARE LLC had no autonomy to decide their own financial course, including no authority to determine how much staff they could provide or what resources were available to the staff.

68.     Upon information and belief, no individuals at REDMAN RD HEALTHCARE LLC are involved in decision making about the financial operations or what its resources were and where they would be spent.

69.     Transactions directed by the Corporate Defendants left REDMAN RD HEALTHCARE LLC with insufficient cash to provide sufficient qualified staff to meet the individual needs of the residents in their facility during Resident's time there.

## LEGAL BASIS FOR CORPORATE DEFENDANTS' LIABILITY

### Joint Venture/Enterprise

70.     As stated above, REDMAN RD HEALTHCARE LLC; REDMAN RD CONSULTING LLC; VERTICAL HEALTH SERVICES LLC are referred to herein as the "Corporate Defendants."

71.     The Corporate Defendants directed, operated, and managed the day-to-day functions of their skilled nursing facilities -- including REDMAN RD HEALTHCARE LLC -- by developing and implementing policies, practices and procedures affecting all facets of REDMAN RD HEALTHCARE LLC, including resident care.

21

72. These policies manipulate and control the physical and financial resources and prohibit decision making at REDMAN RD HEALTHCARE LLC level.

73. This directly affects resident care by determining things such as what type and quality of nourishment is available for residents; what safety measures may and may not be used depending upon cost; the integrity of the building itself; and most importantly, how much staff is available to provide resident care and how well trained and supervised are the staff to meet the needs of the residents.

74. The Corporate Defendants affirmatively chose and decided to establish such operations and demand they be implemented.

75. Upon information and belief, such operations included the following dangerous policies and practices: (a) the aggressive recruitment and admission of high acuity patients to increase the patient census when Defendants had already chosen to understaff REDMAN RD HEALTHCARE LLC and continually maintain a staff that were not qualified nor competent to provide the care required by state law, regulations and minimum standards of the medical community; and (b) the decision to retain residents whose needs exceeded the qualification and care capability of REDMAN RD HEALTHCARE LLC's staff.

76. The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (a) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (b) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

77. The Corporate Defendants conducted themselves in a manner which indicates a joint venture/enterprise:

   a. The shared interest in the operation and management of skilled nursing facilities;

22

b. The express and implied agreements amongst them to share in the profits and losses of such venture/enterprise; and

c. The obvious actions taken showing the cooperation in furthering the venture/enterprise operating and managing skilled nursing facilities.

78. Missouri law recognizes a joint venture/enterprise where the parties alleged to be partners in such venture/enterprise share a common interest in the property or activity or the joint venture; maintain agreements, either express or implied, to share in profits or losses of the venture/enterprise; and express actions or conduct showing cooperation in the project of the venture/enterprise.

79. The Corporate Defendants and REDMAN RD HEALTHCARE LLC maintain agreements to share in the profits or losses of the operation of skilled nursing facilities described herein; and operate daily evincing conduct which indicates their cooperation in the venture of operating and managing skilled nursing facilities for profit.

80. The Corporate Defendants and REDMAN RD HEALTHCARE LLC took direct, overt, and specific actions to further the interest of the joint enterprise.

81. These actions were taken through a joint venture/enterprise or through the Corporate Defendants and REDMAN RD HEALTHCARE LLC's officers, directors, managers and or employees.

82. The Corporate Defendants had an equal right to share in the profits and to bear liability for, the joint venture/enterprise.

83. Further, because the Corporate Defendants and REDMAN RD HEALTHCARE LLC were dominated by each other, these entities had an equal right to direct or control their venture, as well as to direct or control the operation and management of REDMAN RD HEALTHCARE LLC.

23

**Direct Participation/Individual Actions**

84. The Corporate Defendants were always material to this lawsuit in the business of managing, owning, and operating a network of skilled nursing facilities throughout the Missouri and the country. One such skilled nursing facilities was REDMAN RD HEALTHCARE LLC where Resident was admitted for care and treatment.

85. At all times material to this lawsuit, the Corporate Defendants were fully aware that the delivery of essential care services in each of their skilled nursing facilities -- including REDMAN RD HEALTHCARE LLC -- hinged upon three fundamental fiscal and operational policies which were dictated by their choices on establishing and implementing such policies: (1) the determination of the numbers and expenditures on staffing levels; (2) the determination of the census levels within the skilled nursing facilities; and, (3) payor mix.

86. At all times material, the Corporate Defendants made critical operational decisions and choices which manipulated and directly impacted REDMAN RD HEALTHCARE LLC's revenues and expenditures. More particularly, the Corporate Defendants determined:

   a. The number of staff allowed to work in their chains of skilled nursing facilities including REDMAN RD HEALTHCARE LLC;

   b. The expenditures for staffing at the skilled nursing facilities including REDMAN RD HEALTHCARE LLC;

   c. The revenue targets for each skilled nursing facilities including REDMAN RD HEALTHCARE LLC;

   d. The payor mix, and census targets for each skilled nursing facilities including REDMAN RD HEALTHCARE LLC;

   e. Patient recruitment programs and discharge practices at each skilled nursing facilities including REDMAN RD HEALTHCARE LLC.

24

87. All cash management functions, revenues and expenditure decisions at the skilled nursing facilities level -- including REDMAN RD HEALTHCARE LLC -- were tightly managed, directed, and supervised by the Corporate Defendants.

88. It was the choices made by the Corporate Defendants which directly fixed the circumstances in the facilities and the level of care that could, and was, provided at the homes, including REDMAN RD HEALTHCARE LLC.

89. The Corporate Defendants formulated, established and mandated the application and implementation of the policies regarding the staffing levels and expenditures, the census levels, and payor mix.

90. The census edicts, marketing and admission practices, and resident discharge policies designed and mandated by the Corporate Defendants were implemented and such application was carefully supervised and enforced.

91. Following the mandates, REDMAN RD HEALTHCARE LLC functioned in accordance with them, filling empty beds, recruiting high acuity patients, and maintaining a census level and staffing level established and enforced as the Corporate Defendants deemed appropriate.

92. Accordingly, such manipulation by the Corporate Defendants as to staffing and census were motivated by the financial needs of the Corporate Defendants and REDMAN RD HEALTHCARE LLC as opposed to the acuity levels and needs of the residents as dictated by state and federal laws and regulations.

93. Instead of abiding by their duty to care for the residents, the Corporate Defendants chose to be guided by financial motivation which was simply to increase revenues while restricting and/or reducing expenses.

94. The Corporate Defendants, therefore, directly participated in a continuing course of negligent conduct, requiring REDMAN RD HEALTHCARE LLC to recruit and retain heavier care, higher pay residents to REDMAN RD HEALTHCARE LLC even though the needs of the patient population far exceeded the capacity of staff.

95. At the same time, the Corporate Defendants chose to design, create, implement, and enforce operational budgets at REDMAN RD HEALTHCARE LLC which dictated the level of care that could be provided and therefore deprived residents care, creating widespread neglect.

96. In so doing, the Corporate Defendants disregarded, superseded, and violated the duties and responsibilities imposed on a licensed skilled nursing facility, in this case REDMAN RD HEALTHCARE LLC, by the State of Missouri.

## Corporate Malfeasance

97. The Corporate Defendants consciously chose not to implement safety policies, procedures and systems which would ensure that: (1) the acuity levels and needs of residents were consistent with the numbers and qualifications of direct caregivers; and (2) treatment/care prescribed by a physician was provided in accordance with state laws and professional standards.

98. Accordingly, the Corporate Defendants, by their operational choices and decision making, and to satisfy their desire to grow profits, created a dangerous condition that caused harm to residents.

99. These choices to establish and implement such policies and the conscious decision not to implement corrective actions or procedures disregarded the duties which the State of Missouri and federal government imposed upon the Corporate Defendants and REDMAN RD HEALTHCARE LLC.

100. Because the staffs were below necessary levels, and because the staffs that were present were not properly qualified or trained, the residents at REDMAN RD HEALTHCARE LLC including Resident, failed to receive even the most basic care required to prevent catastrophic injury and death. This negligence and resulting injuries ultimately led to and caused Resident's injuries as described above.

101. During Resident's residency at REDMAN RD HEALTHCARE LLC, Resident sustained physical injuries as described in more detail above, because of the acts, omissions, decisions, and choices made by the Corporate Defendants in operating REDMAN RD HEALTHCARE LLC.

102. During Resident's residency at REDMAN RD HEALTHCARE LLC, the Corporate Defendants negligently failed to provide and/or hire, supervise and/or retain staff capable of providing Resident with a clean, safe, and protective environment, and that, because of this failure, Resident suffered neglect, abuse, severe personal injuries, conscious pain and suffering, and deterioration of Resident's physical condition as further described above.

103. The Corporate Defendants manage, operate, and direct the day-to-day operations of REDMAN RD HEALTHCARE LLC and the Corporate Defendants are liable for this direct involvement in the operations of such Facility. The Corporate Defendants are therefore liable to the Plaintiff for the neglect of and injuries to Resident.

104. REDMAN RD HEALTHCARE LLC and the Corporate Defendants have been named as Defendants in this lawsuit for their individual and direct participation in the torts and causes of action made the basis of this lawsuit, having:

27

a. Chosen to disregard the duties and responsibilities which REDMAN RD HEALTHCARE LLC, as a licensed skilled nursing facility, owed to the State of Missouri and its residents;

b. Created the dangerous conditions described by interfering with and causing REDMAN RD HEALTHCARE LLC to violate Missouri statutes, laws and minimum regulations governing the operation of said skilled nursing facilities;

c. Superseding the statutory rights and duties owed to skilled nursing facilities residents by designing and mandating dangerous directives, policies, management, and day to day operation of REDMAN RD HEALTHCARE LLC;

d. Caused the harm complained of herein; and

e. Choosing to disregard the contractual obligations owed to the State of Missouri and the Federal Government to properly care for the residents in exchange for payment of funds for such care.

### Count I - (Wrongful Death Against All Defendants)

105. At all times material hereto Resident was in a defenseless and dependent condition.

106. As a result of Resident's defenseless and dependent condition, Resident relied upon Defendants to provide for their safety, protection, care, and treatment.

107. At the time of the negligent acts and occurrences complained of herein and at all other times relevant hereto, Defendants, and their agents and employees, owed a legal duty to Resident to exercise that degree of skill and learning ordinarily exercised by members of their respective professions under the same or similar circumstances.

108. At all relevant times, Defendants had a duty to act in accordance with the standards of care required of those owning, operating, managing, maintaining, and/or controlling a skilled nursing Facility.

109. These duties required Defendants to implement and enforce policies and procedures to ensure the proper care for, and treatment of all residents including Resident.

28

110. These duties required Defendants to have sufficient and qualified staff at REDMAN RD HEALTHCARE LLC skilled nursing facilities to ensure the proper care for, and treatment of all residents including Resident.

111. These duties required Defendants to ensure that REDMAN RD HEALTHCARE LLC's nurses and other staff were properly educated and trained regarding the care for, and treatment of all residents including Resident.

112. These duties required Defendants to ensure that REDMAN RD HEALTHCARE LLC was properly capitalized to ensure the proper care for, and treatment of all residents including Resident.

113. Specifically, during their care and treatment of Resident, Defendants and their agents, servants, and/or employees breached their duties and were guilty of the following acts of negligence and carelessly by failing to measure up to the requisite standard of care, skill, and practice ordinarily exercised by members of their profession under the same or similar circumstances, including by:

   a. Failing to adequately assess, monitor, document, treat, and respond to Resident's physical condition;

   b. Failing to adequately assess Resident's risk of skin breakdown and pressure ulcers;

   c. Failing to implement and follow an appropriate turning and repositioning schedule;

   d. Failing to provide adequate nursing staff to ensure Resident received timely repositioning;

   e. Failing to provide adequate pressure-relieving devices and surfaces;

   f. Failing to maintain adequate nutrition and hydration to promote skin integrity;

   g. Failing to keep Resident clean and dry to prevent moisture-related skin breakdown;

h. Failing to enact and carry out an adequate Care Plan regarding Resident's increased risk for pressure ulcers;

i. Failing to properly stage, document, and treat existing pressure ulcers;

114. As a direct and proximate result of the individual and collective acts of negligence of Defendants as described above, Resident was harmed and suffered non-economic damages, including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life; death; and other damages.

115. As a direct and proximate result of the individual and collective acts of negligence of all Defendants as described above, Plaintiff suffered damages including, loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement, and mental anguish.

WHEREFORE, Plaintiff Asia Caldwell (individually), prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable including only non-economic damages.

### Count III - (Alter Ego Against REDMAN RD CONSULTING LLC)

116. Plaintiff incorporates by reference the allegations previously set forth and further alleges as follows:

117. REDMAN RD HEALTHCARE LLC ("Subsidiary") is so dominated by REDMAN RD CONSULTING LLC that the Subsidiary is a mere instrument of REDMAN RD CONSULTING LLC and is indistinct from REDMAN RD CONSULTING LLC.

30

118. In fact, the Subsidiary is controlled and influenced by REDMAN RD CONSULTING LLC in that REDMAN RD CONSULTING LLC exercised complete control and domination over the Subsidiary finances and business practices.

119. Specifically, REDMAN RD CONSULTING LLC complete control and domination over the Subsidiary caused the Facility's undercapitalization and understaffing while Resident was at the Facility.

120. REDMAN RD CONSULTING LLC's complete control and domination over the Subsidiary caused the Subsidiary to operate at a loss during the two years preceding the negligence in this case.

121. REDMAN RD CONSULTING LLC's complete control and domination over the Subsidiary caused the Subsidiary's liabilities to exceed its assets during the two years preceding the negligence in this case.

122. Specifically: (1) REDMAN RD CONSULTING LLC own all or most of the capital stock of the Subsidiary; (2) REDMAN RD CONSULTING LLC and the Subsidiary have common directors or officers; (3) REDMAN RD CONSULTING LLC finance the Subsidiary; (4) REDMAN RD CONSULTING LLC subscribe to all of the capital stock of the Subsidiary; (5) REDMAN RD CONSULTING LLC caused the incorporation of the Subsidiary; (6) The Facility has grossly inadequate capital; (7) REDMAN RD CONSULTING LLC pays the salaries and other expenses or losses of the Subsidiary; (8) REDMAN RD CONSULTING LLC use the property of the Subsidiary as its own; and (9) The directors or executives of the Subsidiary do not act independently in the interest of the Subsidiary but take their orders from REDMAN RD CONSULTING LLC in the latter's interest.

31

123. Thus, REDMAN RD CONSULTING LLC used the corporate cloak of the Subsidiary as a subterfuge to defeat public convenience, to justify a wrong, and/or to perpetrate a fraud in that REDMAN RD CONSULTING LLC's complete control and domination of the Subsidiary depleted all the Subsidiary's assets, thereby making it unable to pay a judgment resulting from its care of residents including Resident.

124. This undercapitalization and understaffing violated REDMAN RD HEALTHCARE LLC's duties and the applicable standard of care owed by a skilled nursing facilities operator or manager to the Facility's residents.

125. As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary -- and REDMAN RD CONSULTING LLC -- Resident was harmed and suffered non-economic damages including pain, suffering, mental anguish, disability, disfigurement, and loss of enjoyment of life, death, and other damages.

126. As a direct and proximate result of the individual and collective acts of negligence of the Subsidiary, -- and REDMAN RD CONSULTING LLC -- Plaintiff, suffered damages including loss of companionship, loss of comfort, loss of guidance, loss of counsel and loss of instruction, pain, suffering, bereavement, conscious pain and suffering; and mental anguish.

WHEREFORE, Plaintiff, prays for judgment against Defendants in an amount more than $75,000.00 and in an amount a jury deems fair and reasonable including non-economic damages and past medical expenses.

**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE**

Respectfully Submitted,

STEELE LAW FIRM II, LLC

*/s/ Jonathan Steele*
Jonathan Steele
MO#63266/KS#24852/OK# #35997
Email: jonathan@nursinghomeabuselaw.com
Direct: (913) 356-9630
Office: (816) 466-5947
Fax: (913) 416-9425
nursinghomeabuselaw.com

Missouri Office
2029 Wyandotte, Suite 100
Kansas City, MO 64108

Oklahoma Office
15401 N. May Ave., Suite 1100
Edmond, OK 73013

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that the below-signed Attorney signed the original of the above and foregoing and is maintaining the original copy at said Attorney's office, and that on 2026-02-09 a copy of the above and foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system to all parties and attorneys of record.

*/s/ Jonathan Steele*
Attorney for Plaintiff(s)

33